**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ANTHONY BERNARD MATHIS, | § | |
| (Reg. #56231-179) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-3703 |
| | § | |
| BRAZORIA COUNTY SHERIFF'S | § | |
| OFFICE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Anthony Bernard Mathis, is currently an inmate of the Federal Correctional

Complex in Beaumont, Texas.[1]  Mathis sues under 42 U.S.C. § 1983, alleging that while

incarcerated at the Brazoria County Jail from June 10 to September 29, 2008, he was denied a kosher

diet, denied medical care, denied due process, and was subject to retaliation.  Mathis, proceeding

*pro se* and *in forma pauperis*, sues the Brazoria County Sheriff's Office ("BCSO") and certain

officers and employees: Charles S. Wagner, Sheriff; Straughter, a nurse; Mary Anguiano, a food-

service supervisor; John Langley, a grievance officer; and Margie Alexander, an inmate trust fund

bookkeeper.

On April 29, 2009, Mathis filed a more definite statement describing his claims.  (Docket

Entry No. 10).  On August 10, 2009, this court instructed the District Attorney for Brazoria County

---

[1]   Mathis was convicted of conspiracy to distribute and possess with intent to distribute five kilograms of
cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846.  He was sentenced to 121 months in federal custody,
five years of supervised release, a $100 assessment, and $750 in fines. (Docket Entry No. 13-2, *Martinez*
Report, p. 10).

to provide the administrative record of relevant medical and grievance records for Mathis from June 1 to September 30, 2008.[2]  (Docket Entry No. 11).   The District Attorney's Office complied. (Docket Entry No. 13).

On July 20, 2010, this court ordered service on the BCSO, Sheriff Wagner, Nurse Straughter, Supervisor Anguiano, Officer Langley, and Deputy Alexander.  (Docket Entry No. 21).  The BCSO, Sheriff Wagner and  Nurse Straughter, Supervisor Anguiano, Officer Langley, and Deputy Alexander ("the Straughter Defendants") filed motions to dismiss.  (Docket Entry No. 33, 34, 35). On November 17, 2010, the BCSO, Sheriff Wagner, and the Straughter Defendants moved for summary judgment.  (Docket Entry No. 37, 41).  On December 15, 2010, this court granted Mathis an extension until January 31, 2011 to respond to the dispositive motions.  (Docket Entry No. 45). Mathis has not responded.

Based on the pleadings, the motions, the summary judgment record, and the applicable law, this court grants the defendants' motions for summary judgment and denies their motions to dismiss as moot.  Final judgment is entered by separate order.  The reasons for these rulings are explained below.

---

[2]   In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the Tenth Circuit approved a district court's order that prison officials investigate the facts surrounding a civil rights suit by inmates to construct "an administrative record . . . to enable the trial court to . . . make a determination [of frivolity] under section 1915(a)." *Id*. at 319.  The trial court had required the defendants to attach all relevant reports to their answers. *See also Hardwick v. Ault*, 517 F.2d 295, 298 (5th Cir. 1975) (alluding to use of a "special report" filed by prison officials in response to prisoner's claim).  Use of the *Martinez* Report has been approved by the Fifth Circuit in *Cay v. Estelle*, 789 F.2d 318 (5th Cir. 1986) and *Parker v. Carpenter*, 978 F.2d 190, 191 n.2 (5th Cir. 1992).  *See also Graves v. Hampton*, 1 F.3d 315, 319 n.20 (5th Cir. 1993) (noting with approval the *Martinez* procedure of ordering prison officials to investigate the facts surrounding a civil rights suit by inmates to construct an administrative record which will enable the trial court to pierce the veil of the complaint's factual allegations and make a determination concerning frivolousness).

I.      **Mathis's Allegations**

Mathis was confined at the BCSO from June 10 to September 29, 2008.  He alleges that during that time, he was denied medical care and kosher meals.  He claims that Sheriff Wagner implemented unconstitutional policies, Nurse Straughter denied him kosher meals, and Officer Langley failed to resolve grievances.

To support his allegations that BCSO officers and employees knew he needed a kosher diet, Mathis asserts that two BCSO officers transporting him from FCC-Beaumont Low to the BCSO on June 10, 2008 received his records from FCC-Beaumont Low.  The records showed that Mathis required a kosher diet.  Mathis also told the BCSO booking officer and Nurse Straughter of his need for a kosher diet.  He alleges that Nurse Straughter told him: "we do not provide religious/kosher meals, just eat around the pork when it's on your tray."  (Docket Entry No. 2, p. 4).  Two officers told Mathis that he would need a court order to receive kosher meals.  Mathis states that he was denied access to means of worship while at the BCSO and that he was prohibited from practicing his Jewish faith in his cell, although he offers no specifics other than the denial of kosher meals.

Mathis alleges that the denial of kosher meals violated his First Amendment right to free exercise of religion, his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), and his right to equal protection.

Mathis also alleges that the defendants served him contaminated food and were deliberately indifferent to the serious medical needs that resulted.  He alleges that on June 16, 2008, he became constipated because he was not provided with kosher meals.  He was diagnosed with external hemorrhoids and chronic constipation.  On July 24, 2008, Mathis complained of severe stomach pains caused by consuming outdated dairy products and nonkosher foods.  He alleges that medical

personnel did not take his medical history and conduct a physical examination each time he went to the clinic, and that he was not properly tested for food poisoning.  Mathis acknowledges that he was prescribed treatment for his symptoms.  He was given a suppository (although he asserts it took four weeks for that to occur).  He was prescribed fiber tablets and Naproxen for the pain.  He was also prescribed Dulcolax, milk of magnesia, Lactivo, and Metamucil to treat the constipation and stomach pain.

Mathis alleges that on July 25, 2008, Anguiano, the food service supervisor, said that the BCSO was not equipped to provide inmates with religious diets such as kosher meals.  On July 28, 2008, Anguiano went to a grocery store and purchased food to accommodate Mathis's request for a kosher diet.  Mathis claims that the foods she purchased were not properly kosher.  Mathis also alleges that immediately after he ate the items, he again started having sharp stomach pains.

Mathis alleges that on August 10, 2008, defendant Alexander told him that the BCSO had the authority to deduct funds from Mathis's inmate account.  On September 23, 2008, Alexander told Mathis that she had confiscated $9.93 from his inmate account.  He alleges that he was denied due process of law because the funds were withdrawn without his permission.

Mathis alleges that on August 25, 2008, defendant Anguiano retaliated against him for filing a grievance when Anguiano told Mathis that the BCSO would not provide his kosher meals.

Mathis filed a grievance about the denial of kosher meals.  Langley responded to the grievance as follows: "An investigation has been conducted into the allegations contained in your complaint.  Your allegations were found to be: Unfounded . . .  Comments: Absent a court order requiring kosher food, you are being served regular inmate food with the exception for pork, which is not being served to you."  (Docket Entry No. 10, Plaintiff's More Definite Statement, p. 8).

Mathis alleges that on August 22, 2008, he filed an Inmate Grievance Form alleging that he had been given spoiled milk.  In his response dated August 26, 2008, Langley stated: "An investigation has been conducted into the allegations contained in your complaint.  Your allegations were found to be: . . . Substantiated and appropriate action was taken . . . Comments: The jail kitchen has been notified to inspect for out-of-date dairy products in the future."  (Docket Entry No. 10, Plaintiff's More Definite Statement, p. 17).

Mathis seeks the following relief:

A.      a declaratory judgment that the defendants violated the United States Constitution and state law;

B.      compensatory damages of $1,000,000 against each of the defendants;

C.      punitive damages of $1,000,000 against each of the defendants; and

D.      "nominal" damages of $1,000,000 against each of the defendants.

## II.      The Motion for Summary Judgment

### A.      The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the

absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.   The Summary Judgment Evidence

In support of their motions, the defendants provide the following summary judgment evidence:

(A)   the affidavit of Margie Alexander, Brazoria County Sheriff's Office Inmate Trust Fund Bookkeeper;

(B)   the affidavit of Mary Anguiano, Brazoria County Sheriff's Office Food Director;

(C)      the affidavit of J.G. Adkins, Brazoria County Chief Deputy Sheriff;

(C-1)    relevant excerpts from the Brazoria County Sheriff's Department Jail Manual;

(C-2)    Mathis's Inmate Account Records from the Brazoria County Jail;

(C-3)    Mathis's Brazoria County Jail records relating to dietary requests;

(C-4)    Mathis's Brazoria County Jail medical records;

(C-5)    Mathis's Brazoria County Jail grievance records; and

(D)      Federal Bureau of Prisons – Notification of Religious Diet Accommodation.[3]

## III.    The Claims Against BCSO

Mathis named the BCSO as a defendant in this § 1983 suit.   (Docket Entry No. 1, Complaint, p. 1).   Section 1983 imposes liability on any "person" who violates an individual's constitutional rights while acting under color of state law.   A plaintiff may not sue specific departments of a city or county, rather than the city or county itself, if the departments are not political entities capable of suing and being sued.   *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1991); *see also Kirby Lumber Corp. v. La. through Anacoco-Prairie State Game and Fish Comm'n,* 293 F.2d 82, 83 (5th Cir. 1961); *Taylor v. Adm'r of the SBA,* 722 F.2d 105, 110-11 (5th Cir. 1983).   The BCSO is a subdivision of Brazoria County and is not an entity capable of suing or being sued.   The motion for summary judgment filed by the BCSO, (Docket Entry No. 37), is granted.

---

[3]   The exhibits attached to each of the three motions for summary judgment are the same.   (Docket Entry Nos. 37, 39, & 41).

**IV.     The Claims Against the Defendants in Their Individual Capacities**

    **A.     Qualified Immunity**

The defendants assert that they are entitled to qualified immunity because Mathis failed to allege a constitutional violation and because the undisputed evidence shows that their actions were objectively reasonable in light of clearly established law.   (Docket Entry Nos. 41, Defendants' Motion for Summary Judgment, pp. 4-6).   Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Flores v. City of Palacios,* 381 F.3d 391, 393-94 (5th Cir. 2004).

In reviewing a motion for summary judgment based on qualified immunity, a district court may undertake a two-step analysis.   *Flores,* 381 F.3d at 395.   A court determines whether a statutory or constitutional right would have been violated on the facts alleged.  *Saucier v. Katz,* 533 U.S. 194, 200 (2001); *Aucoin v. Haney,* 306 F.3d 268, 272 (5th Cir. 2002).   If no constitutional right would have been violated were the allegations established, then the inquiry ends.  *Saucier,* 533 U.S. at 201.  If a violation is properly alleged, the court determines whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known."   *Flores,* 381 F.3d at 395 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)).  If the law was clearly established at the time of the incident, the court must decide whether the defendant's conduct was objectively reasonable.  *Aucoin,* 306 F.3d at 272.   An official's conduct is objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution.

*Hampton v. Oktibbeha Cnty. Sheriff Dep't,* 480 F.3d 358, 363 (5th Cir. 2007).  Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. *Hernandez ex. rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.,* 380 F.3d 872, 879 (5th Cir. 2004). Courts are free to consider the second step without first deciding whether the facts show a constitutional violation. *See Pearson v. Callahan*, ---- U.S. ---, 129 S. Ct. 808, 818 (2009).

Once a government officer pleads the affirmative defense of qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law. *Bazan v. Hidalgo Cnty.,* 246 F.3d 481, 489 (5th Cir. 2001).  This burden requires the plaintiff to plead "claims of specific conduct and actions giving rise to a constitutional violation." *Baker v. Putnal,* 75 F.3d 190, 195 (5th Cir. 1996).  "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton,* 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

## B.     The First Amendment Claim

### 1.     The Legal Standard

In the First Amendment context, a prisoner retains those rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817 (1974). Prison regulations that limit constitutional rights are reviewed under *Turner v. Safley*, 482 U.S. 78 (1987), to determine whether the regulation is "reasonably related to legitimate penological interests." *Id.* at 89; *see O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349-53 (1987) (applying *Turner*'s standard to free exercise

claim brought by prisoner under § 1983).  It is generally recognized that security, order, and rehabilitation are legitimate penological objectives.  *Morgan v. Quarterman,* 570 F.3d 663 (5th Cir. 2009) (citing *Procunier v. Martinez,* 416 U.S. 396, 413-14 (1974)).

In evaluating the reasonableness of a prison regulation, *Turner* instructs a court to consider four factors:

> (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives that could fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

*Turner,* 482 U.S. at 89-91 (internal citations and quotation marks omitted).

The same standards apply when a court is reviewing an action taken by prison officials rather than a regulation.  *Jackson v. Cain,* 864 F.2d 1235, 1248 (5th Cir. 1989).  However, an "administrative foul-up" depriving an inmate of the right to practice his religious beliefs may amount to mere negligence, insufficient to support a claim for violation of the First Amendment. *See Eason v. Thaler,* 73 F.3d at 1327 n.2 (suggesting that a mistake in providing a meal with pork to an inmate whose diet was to be pork-free with pork meal would amount to mere negligence and would not amount to a violation of the Free Exercise Clause of the First Amendment).

*Turner*'s standard also includes a neutrality requirement.  "The government objective must be a legitimate and neutral one . . . [and] [w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion."  *Id.* at 90. *See Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860-61 (5th Cir. 2004)

("Foremost, TDCJ's regulation is neutral . . . . There is no evidence that TDCJ's policy is targeted toward the Church of Christ, or favors one religious group over another." (internal quotation marks and citations omitted)).

Although the *Turner* standard includes four factors, the Supreme Court has acknowledged the importance of the first factor, explaining that in some cases the second, third, and fourth factors can "add little, one way or another, to the first factor's basic logical rationale." *Beard v. Banks,* 548 U.S. 521, 532 (2006). Under the first factor, "the real task" is to determine whether there is a "reasonable relation" – that is, "more than simply a logical relation" – between the prison regulation and the legitimate penological interest. *Id.* at 533. A court's analysis must give due regard to the decisions of prison officials. *Samford v. Dretke,* 562 F.3d 674 (5th Cir. 2009). "'[P]rison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner,* 482 U.S. at 89 (omission and alteration in original); *see also Freeman v. Tex. Dep't of Criminal Justice,* 369 F.3d 854, 863 (5th Cir. 2004) ("[T]he Court is equally cognizant of the inherent demands of institutional correction, the deference owed to prison administrators, and the subjugation of individual liberty that lawful incarceration necessarily entails.").

The Fifth Circuit has held that prisons need not respond to all individual religious dietary requests to comply with the First Amendment. *See Kahey v. Jones,* 836 F.2d 948 (5th Cir. 1988); *Udey v. Kastner,* 805 F.2d 1218 (5th Cir. 1986). In *Udey*, decided before the Supreme Court's decision in *Turner,* the Fifth Circuit held that the First Amendment did not require a prison to provide an inmate with a diet consistent with his religious beliefs. 805 F.2d at 1221. The court reasoned that meeting each inmate's religious and dietary requirements would place undue costs

and administrative burdens on the prison system.   *Id.*   In *Udey*, a prisoner in the Federal

Correctional Institution asked for religious reasons to be provided with a diet primarily consisting

of organically grown produce washed in distilled water.   The federal prison officials declined.

The inmate refused to eat food provided and was force-fed.   The district court found that the

inmate's religious beliefs were not sincerely held.   The Fifth Circuit reversed and remanded for

an evidentiary hearing to determine whether meeting the inmate's religious and dietary

requirements would place an undue burden on the prison system and whether there was any good

reason not to provide him with food that complied with his religious diet.   The district court held

the appropriate hearings and found that the prison system was not required to cater to the

requests.   On appeal, the Fifth Circuit found as follows:

> Although we have every desire to encourage the Government to
> provide religious dietary alternatives, providing alternatives
> acceptable to practitioners of "majority" religions while failing to
> provide alternatives acceptable to practitioners of less common,
> even unique, religions poses serious Equal Protection/First
> Amendment Establishment concerns.  *See Cruz v. Beto*, 405 U.S.
> 319, 92 S. Ct. 1079, 31 L. Ed.2d 263 (1972).
>
> . . .
>
> As stated in *Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310,
> 323 (5th Cir. 1977) (en banc) (Goldberg, J., specially concurring):
>
>> [A]mong the most important factors in this respect
>> are the institutional consequences of the alternative
>> decision.   When a court can recognize a free
>> exercise claim without inviting numerous additional
>> claims, focusing on the particular consequences of
>> the ruling in the case at bar is appropriate.   But
>> when recognizing the claim will predictably give
>> rise to further claims, many of which will
>> undoubtedly be fraudulent or exaggerated, the
>> situation is different. In that event, the court must
>> either recognize many such claims (so that the

> relevant governmental interest extends beyond the individual claimants in the original action) or draw fine and searching distinctions among various free exercise claimants. The latter course would raise serious constitutional questions with respect to the proper functioning of courts in sensitive religion clause adjudication. . . .
>
> When numerous claims are likely, recognizing some while rejecting others unavoidably forces courts to pick and choose among religions and to draw subtle distinctions on the basis of criteria with which no governmental unit should ever be entangled.
>
> The trial judge cited testimony stating that the potential for proliferation was a "very strong likelihood" and that the number of religious dietary requests has "grown by leaps and bounds." Supplemental Record, Vol. 1, at 73-74. The trial judge specifically found that the proliferation effect would place an undue burden on the prison system. *Id*. at 74.
>
> We believe that the probable proliferation of claims, and the concomitant entanglement with religion that processing multiple claims would require, does constitute a problem that the state has a good reason to avoid. Such proliferation, and the concomitant need to meet multiple distinct dietary requirements, might create undue cost and administrative burdens. We thus AFFIRM the trial court's decision on this ground only.

*Udey,* 805 F.2d at 1220, 1221.

In *Kahey,* the Fifth Circuit held that the prison was not required to accommodate a Muslim inmate's request for a kosher diet with added requirements on the content and preparation of food. 836 F.2d at 950–51. The inmate asserted that her religion prevented her from eating food cooked or served in or on utensils that had come into contact with pork or pork by-product. She asked the prison to provide her with regular meals consisting of eggs, fruit, and vegetables served with shells or peels, on paper plates. The prison officials responded that they had modified the applicable prison regulation, No. 30-22, to provide a protein substitute

whenever pork was served with a prison meal.  They also identified on the prison menus any pork

or shellfish products in the dishes served and, when appropriate, they prepared some dishes, like

beans, both with and without pork.  The Fifth Circuit determined that fulfilling the inmate's

particular requests would require special food, individualized processing, and specialized

containers to avoid any contact with pork.  The Fifth Circuit explained:

> Applying the *Turner* factors, as elaborated in *O'Lone*, LWIC's
> policy for accommodating kosher diets passes muster.  First, there
> is a logical connection between the prison regulation and the
> legitimate governmental interest that justifies it.  *Turner*, at 2262.
> LWIC intends to provide the inmates balanced, uniform meals,
> with protein substitutes for pork and pork products, reserving
> special diets only for medical reasons.  LWIC has a legitimate
> governmental interest in running a simplified prison food service
> rather than a full-scale restaurant.  Second, we must determine
> whether there are alternative means for Kahey to maintain her
> religious practices.  In *O'Lone*, it was deemed significant that
> although the prisoners could not attend a Friday evening Islamic
> service regularly, they were not prevented from otherwise
> participating in Islamic rites, including keeping a kosher diet.
> Although we would not denigrate the significance Kahey attaches
> to following a special diet prepared in a special manner, she
> acknowledges in her pleadings that other Moslems do not
> necessarily adhere to the same standard.  Moreover, she does not
> complain of being deprived of free exercise rights in any other
> fashion.  We must therefore assume that her practice of Islam is not
> entirely circumscribed in the prison, and that this factor, as the
> court found in *O'Lone*, compensates for the prison's failure to
> satisfy her dietary demand.
>
> Third, we must consider the impact of providing Kahey an
> individualized diet on "guards and other inmates, and on the
> allocation of prison resources generally."  *Turner, id.*  LWIC is
> understandably reluctant not only to provide special food, but to
> devote special storage facilities, utensils and preparation effort to
> supplying Kahey's diet.  And, as *Udey* suggests, the prison could
> be expected to encounter many similar requests if Kahey's is
> granted. The expense and diversion of resources from other
> penological goals could be considerable.  Moreover, if other
> prisoners are not similarly accommodated, they might well perceive

14

Kahey as being favored. This perception would have an adverse impact on prison morale. *Compare O'Lone, supra* at 2406. The final factor, according to *Turner*, is whether there are ready alternatives to satisfy Kahey's dietary requirements at de minimis cost to valid penological interests. It would seem obvious that purchasing, storing and preparing food for one prisoner out of hundreds in the LWIC would impose more than de minimis cost on the prison. The only alternative suggested by Kahey, providing food in hulls or shells served on paper plates, nevertheless requires the prison to set aside resources uniquely for her benefit. In comparison to the cost of the pork-free diet already made available to Kahey through the general prison food service, we cannot conclude that the cost of her preferred kosher diet would be de minimis. We believe the LWIC's reluctance to supply an individualized kosher diet and preparation for Kahey fully accords with the result and reasoning of *Turner* and *O'Lone*. *See also McCabe v. Arave*, 827 F.2d 634 (9th Cir. 1987); *Allen v. Toombs*, 827 F.2d 563 (9th Cir. 1987) (both cases substantially upholding prison regulations limiting certain religious activities). As *O'Lone* concludes, "We take this opportunity to reaffirm our refusal, even where claims are made under the first amendment, to 'substitute our judgment on . . . difficult and sensitive matters of institutional administration,' *Block v. Rutherford*, 468 U.S. 576, 588, 104 S. Ct. 3227, 3233, 82 L. Ed.2d 438 (1984), for the determinations of those charged with the formidable task of running a prison." 107 S. Ct. at 2407. Consequently, the summary judgment awarded by the district court must be AFFIRMED.

*Kahey,* 836 F.2d at 950-51.

More recently, in *Baranowski v. Hart,* 486 F.3d 112 (5th Cir. 2007), the prisoner argued that the defendants had impeded his free exercise of religion under the First Amendment by depriving him of kosher meals as required by his faith. The Fifth Circuit held: "For the reasons stated by the courts in *Kahey* and *Udey,* we conclude that denial of a kosher diet does not violate Baranowski's free exercise rights. Consequently, we affirm the district court's dismissal of Baranowski's First Amendment claim." *Baranowski,* 486 F.3d at 122.

2.    **Analysis**

Applying the *Turner* factors as elaborated in *O'Lone*, BCSO's policy for accommodating kosher diets passes muster. First, there is a logical connection between BCSO's practice and the legitimate governmental interest that justifies it. *Turner*, at 2262. The summary judgment evidence shows that BCSO's policy is to provide the inmates balanced, uniform meals, reserving special diets for medical reasons. BCSO has a legitimate governmental interest in running a simplified prison food service rather than accommodating individual preferences.

Other than the denial of a kosher diet, Mathis offers no explanation as to how his right to freely exercise his religion was curtailed. The summary judgment evidence shows that the BCSO provided opportunities for Mathis to exercise his religion while in the BCSO. The BCSO Jail Manual provides, in relevant part:

### 8.14.5 POLICY:  RELIGIOUS PRACTICE PLAN

Inmates will be allowed access to religious services normally available in the community.

PROCEDURE

The objective of the inmate religious practices plan is to provide inmates with the opportunity to continue practices consistent with their religious beliefs, without jeopardizing the safety and security of the facility or presenting an undue burden on the county resources.

The Jail Chaplain will coordinate volunteers from Brazoria county churches or known religious organizations to provide church services to as many tanks as possible every Sunday morning[.]

Religious services will be held in multi-purpose rooms. This is not mandatory for inmates, but is on a voluntary basis.

Services will be held on Sunday mornings. They may run later if needed.

Bibles, New Testaments, Bible study courses, and other religious literature are available through the Chaplain upon request.

If an inmate requests, a clergyman of choice may visit, if the clergyman is a pastor of a local church, or belongs to a known religious organization where the clergy status can be verified.

Any inmate who wishes to carry out any religious practice that would ordinarily violate facility rules or requires a special accommodation must make written request to the Jail Captain, explaining what he/she wishes to do and providing evidence that the request is in fact bona fide. The Jail Captain or designee will determine whether the request can be accommodated without presenting an undue burden or endangering the safety and security of the facility, and provide written response to the inmate's request, including reasons for any denial.

Inmates may use the established inmate grievance procedure to send the Sheriff a request for review of denials they believe to be unjust. The Sheriff's decision will be final.

(Docket Entry No. 39, Wagner's Motion for Summary Judgment, Ex. C-1, p. 6). Mathis neither identifies nor provides summary judgment evidence of any limit on his religious practices besides the absence of a fully kosher, as opposed to a pork-free, meal.

The third *Turner* factor requires this court to consider the impact of providing Mathis an individualized diet on "guards and other inmates, and on the allocation of prison resources generally." Mary Anguiano testified as follows:

1. My name is Mary Anguiano. I am of sound mind, over the age of 18, and capable of making this affidavit. I have personal knowledge of the facts stated in this affidavit, and they are true and correct.

2. I am an employee of the Brazoria County Sheriff's Office. My title is Food Director. I have been employed by the Brazoria County Sheriff's Office for 25 years. I have served as Food Director for 15 years.

3. The Brazoria County Jail generally does not provide special meals to inmates, unless it is required due to a medical condition. This policy includes all inmates of all faiths.  The jail cannot provide purely kosher meals to inmates.  This means that the jail does not specially prepare meals in a kosher manner.  The only way that the jail could comply with a request for kosher meals would be to order pre-cooked meals from an outside vendor.  The jail could not prepare completely kosher meals at the jail because the jail has only one kitchen.  Cooking kosher meals at the jail would require the construction of a new and separate kitchen area, the purchase of separate equipment and utensils, and the possible hiring of more personnel to prepare the meals separately.

4. At the Brazoria County Jail, we aim to provide nutritional meals to all inmates.  This must be done with a limited budget.  As Food Director, I oversee the purchase of inmate meals and must ensure that the jail kitchen stays within its budget.  The jail has a budget that allows it to spend $0.72 per inmate per meal.  The jail kitchen must provide nutritional meals to all inmates and stay within this budget.

5.  In addition to needing to stay within budget, the Brazoria County Jail does not provide special meals for certain employees [sic] because doing so would give the impression of preferential treatment.   Providing preferential treatment to certain inmates creates resentment and potential conflict among inmates.  Another reason the jail does not provide special meals to certain inmates is other inmates would also begin requesting these meals.  Handling a large number of requests would be burdensome on the jail personnel.

6. Anthony Mathis arrived at the Brazoria County Jail on June 10, 2008.  Mr. Mathis requested that he be served kosher meals.  The jail kitchen served Mr. Mathis porkfree meals.  Mr. Mathis made several complaints that the meals he received did not satisfy his religious needs.  Mr. Mathis demanded that his meals be prepared separately from the general population's meals.   Mr. Mathis required the meals be made with different equipment and in a different area, and that his food not come near the general population's food.  Mr. Mathis told me that he had a federal court order requiring the jail to serve him kosher meals.  So, on August 27, 2008, I ordered pre-cooked kosher meals for him from Glazier Foods Company.  According to Mr. Mathis, these meals were still not up to the standard Mr. Mathis said his food needed to be

because they were heated up in the same microwave used for other inmates' meals.  Mr. Mathis was fed these meals in August and September 2008.  After ordering the kosher food, it was discovered that the court order Mr. Mathis referenced did not require the jail to feed him kosher foods.  The order Mr. Mathis referenced only applied to federal prison and said that he was entitled to salad bar use where it was part of the Food Service Program.  The Brazoria County Jail does not have a salad bar.

7.  The kosher meals that were purchased for Mr. Mathis cost $285.42.  The jail spends $0.72 on each meal for regular inmates. If inmates were provided kosher meals, the jail kitchen could not meet its budget.

(Docket Entry No. 41, Defendants' Motion for Summary Judgment, Ex. B, pp. 1-2).

The evidence supports a finding that to require BCSO to not only provide special food but also special storage facilities, utensils, ovens, and preparation efforts to supplying Mathis's diet would impact the ability to feed other inmates in a cost-effective manner.  And, as *Udey* suggests, BCSO could be expected to encounter other similar requests if Mathis's request for a fully kosher diet was granted.  The expense and diversion of resources from other penological goals could be considerable.  If other prisoners were not similarly accommodated, they might perceive Mathis as receiving special treatment, which is also undesirable.

The final *Turner* factor is whether there are ready alternatives to satisfy Mathis's dietary requirements at de minimis cost to valid penological interests.  Purchasing, storing, and preparing food separately for individual prisoners among the hundreds in the BCSO would impose more than de minimis cost on the prison.  In comparison to the cost of the pork-free diet already made available to Mathis through the general prison food service, the cost of providing a strict kosher diet satisfactory to Mathis would not be de minimis.  The evidence showed that the efforts to accommodate Mathis's request for a kosher diet by buying him food from an outside vendor were

both very expensive and still unacceptable to him.  The BCSO's reluctance to supply an individualized kosher diet for Mathis meets with the result and reasoning of *Turner* and *O'Lone*. This court will not substitute its "judgment on . . . difficult and sensitive matters of institutional administration, . . ., for the determinations of those charged with the formidable task of running a prison."  *O'Lone,* 107 S. Ct. at 2407.

Mathis has failed to identify a genuine issue of material fact as to the reasonableness of the BCSO's policy or its application to him.  Viewed in the light most favorable to Mathis, a rational trier of fact could not reasonably find in his favor on this issue, based on the evidence in the record.  The defendants are entitled to judgment as a matter of law on Mathis's claim that defendants violated his First Amendment right to the free exercise of religion by refusing to provide kosher meals.

### C.     The RLUIPA Claim

#### 1.     The Legal Standard

RLUIPA is Congress's second effort to give heightened statutory protection to religious exercise after the Supreme Court's decision in *Emp't  Div., Dep't of Human Res. v. Smith,* 494 U.S. 872 (1990).  Congress first enacted the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.,* to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed.2d 15 (1972), . . . in all cases where free exercise of religion is substantially burdened." § 2000bb(b)(1).  *See generally Gonzales v. O Centro Espírita Beneficente União do Vegetal,* 546 U.S. 418, 424 (2006).  The Supreme Court held RFRA unconstitutional as applied to state and local governments because it exceeded congressional power under section 5 of the Fourteenth

Amendment.  *See City of Boerne v. Flores,* 521 U.S. 507 (1997).   Congress responded by

enacting RLUIPA under its Spending Clause and Commerce Clause authority.  *Sossamon v. Tex.*,

131 S. Ct. 1651 (2011).  RLUIPA borrows important elements from RFRA – which continues to

apply to the federal government – but RLUIPA is less sweeping in scope.  *See Cutter v.*

*Wilkinson,* 544 U.S. 709, 715  (2005).  It targets two areas of state and local action: land-use

regulation, 42 U.S.C. § 2000cc (RLUIPA § 2), and restrictions on the religious exercise of

institutionalized persons, § 2000cc–1 (RLUIPA § 3).

　　　　RLUIPA states:

> [n]o government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution . . .
> even if the burden results from a rule of general applicability,
> unless the government demonstrates that imposition of the burden
> on that person–
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1(a).  "RLUIPA thus protects institutionalized persons who are unable freely

to attend to their religious needs and are therefore dependent on the government's permission and

accommodation for exercise of their religion."  *Cutter v. Wilkinson,* 544 U.S. 709 (2005).

　　　　An inmate seeking relief under RLUIPA has the initial burden of demonstrating that the

challenged prison policy substantially burdens his exercise of religion.   *See* 42 U.S.C.

§§ 2000cc-1(a)-2000cc-2(b).  To meet this burden, the plaintiff must show (1) that the burdened

activity is a "religious exercise," and (2) that the burden is substantial.   RLUIPA defines

"religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a

system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  In *Adkins v. Kaspar,* the Fifth Circuit

defined "substantial burden" as follows:

> [A] government action or regulation creates a "substantial burden"
> on a religious exercise if it truly pressures the adherent to
> significantly modify his religious behavior and significantly violate
> his religious beliefs. . . . [T]he effect of a government action or
> regulation is significant when it either (1) influences the adherent
> to act in a way that violates his religious beliefs, or (2) forces the
> adherent to choose between, on the one hand, enjoying some
> generally available, non-trivial benefit, and, on the other hand,
> following his religious beliefs.

393 F.3d 559, 570 (5th Cir. 2004) (citations omitted).

The statute "requires a case-by-case, fact-specific inquiry to determine whether the

government action or regulation in question imposes a substantial burden."  *Id.* at 571.  If the

plaintiff satisfies this requirement, the burden shifts to the defendant to demonstrate that the

challenged policies are the least restrictive means to further a compelling governmental interest.

*Baranowski v. Hart,* 486 F.3d 112, 124 (5th Cir. 2007) (citation omitted).  In making this

determination, the court must defer "to the experience and expertise of prison and jail

administrators in establishing necessary regulations and procedures to maintain good order,

security and discipline, consistent with consideration of costs and limited resources."  *Cutter v.

Wilkinson,* 544 U.S. 709, 723 (2005) (citation omitted).  RLUIPA "is not meant to elevate

accommodation of religious observances over the institutional need to maintain good order,

security, and discipline or to control costs."  *Baranowski,* 486 F.3d at 125 (citation omitted).

In *Baranowski*, the Fifth Circuit considered and rejected a RLUIPA claim based on the

failure to provide kosher meals.  The Fifth Circuit explained:

> Baranowski next argues that his inability to observe
> Sabbath and other holy day services and his inability to consume

kosher meals substantially burden his ability to practice Judaism, in violation of RLUIPA.  As a "Torah-observant Jew," Baranowski claims that he is compelled to observe the Sabbath and other holy days and to consume kosher food.  He contends that the substantial burdens imposed by Defendants pressure him to modify his behavior and to violate his sincerely held religious beliefs. Defendants counter that Baranowski has failed to establish that his religious practices are substantially burdened.  In the alternative, Defendants argue that their policies are the least restrictive means of furthering their compelling interests of security, safety, space, personnel, and financial concerns for the prison and its inmates and employees.

. . .

There is no question that the activities alleged to be burdened in this case — Jewish Sabbath and holy day services and keeping kosher — qualify as "religious exercises" for the practice of Judaism under RLUIPA's generous definition.  *See Adkins,* 393 F.3d at 567–68 (stating that Sabbath and holy day gatherings "easily qualify as 'religious exercise'"); *Guzzi v. Thompson,* 470 F. Supp.2d 17, 25 (D. Mass. 2007) (stating that the practice of "keeping kosher" constitutes a religious exercise for the Jewish faith).

. . .

In *Adkins,* we considered the meaning of "substantial burden," which is not defined by the statute.  We held that "for purposes of applying the RLUIPA in this circuit, a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." 393 F.3d at 569–70.  The court cautioned, however, that "our test requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a significant burden on an adherent's religious exercise. . . ."  *Id.* at 571.

. . .

We next consider whether the failure of Defendants to provide Baranowski with a kosher diet constitutes a substantial burden on his religious exercise.  Baranowski argues that his

inability to consume kosher food has pressured him to modify his behavior and to violate his sincerely held religious beliefs. *Cf. Ran–Dav's County Kosher, Inc. v. New Jersey,* 129 N.J. 141, 608 A.2d 1353, 1355–56 (1992) (describing Jewish dietary laws and their significance to Judaism). Given the strong significance of keeping kosher in the Jewish faith, the TDCJ's policy of not providing kosher food may be deemed to work a substantial burden upon Baranowski's practice of his faith.

Turning to the compelling interest test, Defendants must show that their dietary policy of not providing kosher meals is the least restrictive means of furthering a compelling governmental interest. As the Supreme Court recently explained, "'[c]ontext matters' in the application of that standard." *Cutter,* 544 U.S. at 723, 125 S.Ct. 2113 (quoting *Grutter v. Bollinger,* 539 U.S. 306, 327, 123 S. Ct. 2325, 156 L. Ed.2d 304 (2003)). Courts should apply the "compelling governmental interest" standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting S. Rep. No. 103–111, at 10 (1993) 1993 U.S.C.C.A.N. 1892, 1899). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs. *See Lovelace v. Lee,* 472 F.3d 174, 190 (4th Cir. 2006).

The uncontroverted summary judgment evidence submitted by Defendants establishes that TDCJ's budget is not adequate to cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from the outside; that TDCJ's ability to provide a nutritionally appropriate meal to other offenders would be jeopardized (since the payments for kosher meals would come out of the general food budget for all inmates); that such a policy would breed resentment among other inmates; and that there would be an increased demand by other religious groups for similar diets.

Based on the record before us, we hold that this policy is related to maintaining good order and controlling costs, and, as such, involves compelling governmental interests. *Cf. Andreola v. Wisconsin,* 211 Fed. Appx. 495, 498–99, 2006 WL 3724633, at *3 (7th Cir. Dec. 18, 2006) (unpublished) (finding no RLUIPA violation where the defendant did not provide kosher meals based

on the compelling governmental interests of maintaining security and "abating the costs of a prisoner's keep").   Further, the administrative and budgetary interests at stake cannot be achieved by any different or lesser means.  *Cf. Cutter,* 544 U.S. at 726, 125 S. Ct. 2113 ("Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."). Accordingly, we conclude that the district court properly granted summary judgment on Baranowski's RLUIPA claim.

*Baranowski,* 486 F.3d at 123-126.

As in *Baranowski,* the uncontroverted summary judgment evidence establishes that denying kosher meals was related to maintaining good order and controlling costs.  BCSO's budget cannot cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from outside the BCSO *and* preparing the meals separately from all other food.  Even if the jail ordered pre-cooked meals from an outside vendor, the jail has only one kitchen and could not prepare them to meet strict kosher standards.  Cooking kosher meals at the jail would require the construction of a new and separate kitchen area, the purchase of separate equipment and utensils, and hiring more personnel.  BCSO's ability to provide a nutritionally appropriate meal to other offenders would be jeopardized.  The jail's budget allows it to spend $0.72 per inmate per meal.  The jail kitchen must provide nutritional meals to all inmates within this budget.  The cost of the  kosher meals purchased for Mathis was $285.42.  If inmates were provided kosher meals, even without the expense of special preparation, the jail kitchen could not meet its budget.

The BCSO does not provide special meals for certain inmates for the additional reason that doing so would give the impression of preferential treatment.   Providing preferential treatment to certain inmates could create resentment and potential conflict among inmates.  The

BCSO manual specifically prohibits preferential treatment for certain inmates.  (Docket Entry No. 39, Defendant Wagner's Motion for Summary Judgment, Ex. C-1, p. 1).  If the BCSO provided special meals to certain inmates, other inmates would also begin requesting these meals. Handling a large number of requests would be even more burdensome on the jail personnel. (Docket Entry No. 41, Defendants' Motion for Summary Judgment, Ex. B, pp. 1-2).

As noted above, the summary judgment evidence shows that when the BCSO kitchen served Mathis pork-free meals, he complained that the meals did not satisfy his religious needs. Mathis requested that his meals be made with different equipment, I a different area, and be kept separate from, the general population's food.  Anguiano ordered pre-cooked kosher meals for Mathis from an outside vendor, but Mathis complained that these meals were still not compliant because they were heated in the same microwave used for other inmates' meals.  The summary judgment evidence shows that BCSO tried to honor Mathis's request for a kosher diet by providing him a pork-free diet and by providing kosher meals purchased from outside vendors. This court determines that BCSO's practice of refusing to provide compliant kosher meals is related to maintaining good order and controlling costs, which are compelling governmental interests.  These interests cannot be achieved by different or lesser means.  Summary judgment is granted dismissing Mathis's RLUIPA claim.

### D.    The Denial of Medical Care Claim

#### 1.    The Legal Standard

The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners, whether by prison doctors or by prison guards and whether by intentionally denying or delaying access to medical care.  *Estelle v.*

*Gamble,* 429 U.S. 97, 104 (1976).   Deliberate indifference to the serious medical needs of prisoners may violate the Eighth Amendment.   *Harris v. Hegmann,* 198 F.3d 153, 159 (5th Cir. 1999); *Estelle v. Gamble,* 429 U.S. 97 (1976).   "Deliberate indifference is an extremely high standard to meet."   *Domino v. Tex. Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001). Deliberate indifference requires a showing of unnecessary and wanton infliction of pain, rising "to the level of egregious intentional conduct."   *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1999); *Gobert v. Caldwell,* 463 F.3d 339, 351 (5th Cir. 2006).

A prison official may not be found liable under the Eighth Amendment unless the official knows of and disregards an excessive risk to inmate health or safety.   *Farmer v. Brennan,* 511 U.S. 825, 839-40 (1994).   The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference.   *Id.* at 837.   The "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference.   *Farmer,* 511 U.S. at 838.   Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of that risk.   *Id; Reeves v. Collins,* 27 F.3d 174 (5th Cir. 1994).

A claim that prison medical personnel made an incorrect diagnosis does not state a cause of action for deliberate indifference in providing medical care.   *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (citing *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)).   A decision not to provide additional or different treatment "is a classic example of a matter for medical judgment" rather than a basis for an Eighth Amendment claim.   *Estelle,* 429 U.S. at 107.   "Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs."   *Norton v. Dimizana,* 122 F.3d 286, 292 (5th Cir. 1997).   A

plaintiff must allege and raise a fact issue as to whether prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson,* 759 F.2d at 1238.

Deliberate indifference is especially difficult to show when the inmate has been provided with ongoing medical treatment.  "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference."  *Gobert*, 463 F.3d at 346 (citations omitted).  Records showing that an inmate was given medical examinations, treatments, and medications may rebut allegations of deliberate indifference in denying or delaying medical care. *See Varnado v. Lynaugh,* 920 F.2d 320 (5th Cir. 1991).

Mathis claims that the defendants were deliberately indifferent to his serious medical needs by failing to treat him for food poisoning and constipation.  The summary judgment evidence shows that Mathis received the following treatment during the three and one-half months he was confined at the Brazoria County Jail:

| | | |
|---|---|---|
| (1) | June 10, 2008: | During the intake physical, Mathis complained of recent upper respiratory infection, swollen glands, joint pain from old injuries, arthritis and hypertension.  While in federal custody, Mathis was taking Amoxicillin, Fiberlax, Naproxen, Lamotrigine; prescribed Amoxicillin, Fiberlax, Naproxen. |
| (2) | June 12, 2008: | Vital signs checked. |
| (3) | July 3, 2008: | Sick call request.  Mathis complained that he had not had a bowel movement since June 17, 2008; requested pills; prescribed Dulcolax. |
| (4) | July 4, 2008: | Prescribed Naprosyn, Bisacodyl suppository. |

| | | |
|---|---|---|
| (5) | July 15, 2008: | Sick call request.  Mathis complained that Bisacodyl was not strong enough; noted that the Dulcolax worked, but he needed more. |
| (6) | July 16, 2008: | Sick call request.  Mathis complained of constipation; reported that he had only three bowel movements in one month; throwing up; scheduled for appointment. |
| (7) | July 16, 2008: | Complained of high blood pressure; complained of constipation; no distress noted; prescribed Bisacodyl. |
| (8) | July 17, 2008: | Prescribed Lactulose. |
| (9) | July 20, 2008: | Requested an enema. |
| (10) | July 21, 2008: | Complained of constipation; prescribed Lactulose for thirty days. |
| (11) | July 23, 2008: | Complained of constipation; prescribed Ibuprofen and Lactulose. |
| (12) | July 28, 2008: | Complained of sharp pain in stomach resulting from constipation; ordered milk of magnesia and Metamucil. |
| (13) | July 29, 2008: | Prescribed Ibuprofen, Lactulose. |
| (14) | July 30, 2008: | Prescribed milk of magnesia, Metamucil for ten days. |
| (15) | August 11, 2008: | Sick call request.  Mathis complained that he had not had a bowel movement for three weeks; suppository ordered July 24, 2008. |
| (16) | August 12, 2008: | Clinic note, current medication – Lactulose. |
| (17) | August 13, 2008: | Prescribed milk of magnesia for three days. |
| (18) | August 15, 2008: | Issued five Bisacodyl suppositories. |
| (19) | September 2, 2008: | Reported not eating for two weeks; intake weight 208 pounds, current weight 206.6 pounds. |

(Docket Entry No. 42, Mathis's Medical Records, Ex. C-4, pp. 1-32).

The summary judgment evidence shows that Mathis complained of constipation on several occasions. Medical personnel prescribed appropriate medications, including enemas, suppositories, laxatives, stool softeners, and fiber supplements.  The records show that medical personnel prescribed Bisacodyl, Dulcolax, Lactulose, Metamucil, and Milk of Magnesia, which are all used to treat constipation.

Mathis also complains that he was not treated for food poisoning after he consumed spoiled milk on August 22, 2008.  Mathis filed a grievance that same day complaining that he took a bite of cereal and noticed that the milk had a foul odor.  (Docket Entry No. 41, Defendants' Motion for Summary Judgment, Ex. C-5, p. 1).  Mathis claims that he experienced sharp stomach pains as a result of consuming the spoiled milk.  Nothing in the summary judgment evidence shows that Mathis sought medical care for food poisoning in August or September 2008.

Mathis has not made a showing of deliberate indifference because the record shows no evidence that BCSO prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Crim. Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle,* 429 U.S. at 107).  Mathis was seen repeatedly and given medications.  Complaints that more treatment should have been ordered, without more, are insufficient to show deliberate indifference because "the decision whether to provide additional treatment is a classic example of a matter for medical judgment."  *Domino*, 239 F.3d at 756 (internal quotation omitted).  Mathis has not demonstrated that the defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that

they drew the inference.  Mathis has not raised a fact issue as to whether the defendants acted with deliberate indifference under the Eighth Amendment.

Mathis has failed to rebut the defendants' affirmative defense of qualified immunity by showing a disputed fact issue material to determining whether the defendants were deliberately indifferent to his serious medical needs.  *See Pierce v. Smith,* 117 F.3d 866, 871-72 (5th Cir. 1997).  The defendants' motions for summary judgment dismissing Mathis's claim of deliberate indifference to his serious medical needs are granted.

**E.      The Claim Based on a Denial of Equal Protection**

Mathis contends that the BCSO violated his right to equal protection.  To prevail, he must show that the defendant acted with discriminatory purpose.  *See McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 390-92 (1982); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977); *Washington v. Davis,* 426 U.S. 229, 240 (1976).  Mathis must also show that he was treated differently from similarly situated prisoners. *Longoria v. Dretke*, 507 F.3d 898, 904 (5th Cir. 2007).

The Fifth Circuit rejected a claim that the denial of kosher meals violated equal protection in *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007).  The Fifth Circuit stated:

> Baranowski next alleges that Defendants violated his equal protection rights by favoring other religions over Judaism. Specifically, he contends Christian and Muslim services are conducted more frequently than Jewish services, and that other groups have greater access to the chapel. Defendants respond that Baranowski has provided no summary judgment evidence of purposeful discrimination regarding any of his allegations.
>
> To succeed on his equal protection claim, Baranowski "'must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated.'" *Adkins,* 393 F.3d at 566 (quoting *Muhammad v. Lynaugh,* 966 F.2d 901,

903 (5th Cir. 1992)).  "However, the Fourteenth Amendment does not demand 'that every religious sect or group within a prison — however few in numbers — must have identical facilities or personnel.'"  *Freeman,* 369 F.3d at 862–63 (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n.2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). Rather, prison officials must afford prisoners "reasonable opportunities . . . to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]."  *Cruz,* 405 U.S. at 322 n.2, 92 S.Ct. 1079.  "*Turner* applies with corresponding force to equal protection claims."  *Freeman,* 369 F.3d at 863.

Baranowski's equal protection claim must fail.  He has offered no competent summary judgment evidence that similarly situated faiths are afforded superior treatment, or that TDCJ's policies are the product of purposeful discrimination.[FN6]  Although Baranowski claims that other religious groups have greater access to the chapel, it is recognized that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand."  *Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. 1079.  It is therefore not constitutionally impermissible for Defendants to consider the demand and need of the group requesting the chapel, along with space and staffing limitations, when deciding where religious groups will conduct their services. *See id.* (noting that the Constitution does not demand that every religious group, regardless of size, have identical facilities).

> FN6.  To the extent Baranowski is raising an equal protection claim regarding the denial of kosher meals, the uncontroverted summary judgment evidence shows that the TDCJ does not serve kosher meals to any inmate.

In sum, Baranowski has failed to provide anything more than bald and unsubstantiated allegations that Defendants purposefully discriminated against him.  This is not enough to succeed on an equal protection claim.  *See Adkins,* 393 F.3d at 566. We therefore affirm the district court's dismissal of this claim.

*Baranowski*, 486 F.3d at 122-123.

Mathis has similarly failed to meet his burden of demonstrating disparate treatment purposeful discrimination on the part of the BCSO.  The summary judgment evidence shows that

Mathis actually received preferential treatment in the form of kosher meals.  The defendants are entitled to judgment as a matter of law on the equal protection claim.

### F.      The Claim Based on Retaliation

Prison officials may not retaliate against an inmate because that inmate exercised his right of access to the courts or complained to a supervisor about a guard's misconduct.  *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996).  But retaliation claims must be carefully examined so federal courts do not become entangled in every disciplinary act in state penal institutions.  *Woods*, 60 F.3d at 1166 (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994), *cert. denied*, 514 U.S. 1022 (1995)).  To prevail on a retaliation claim, an inmate must establish: (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for exercising that right, (3) a retaliatory or adverse act, and (4) causation.  *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).  Causation requires a showing that "but for the retaliatory motive the complained of incident . . . would not have occurred."  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (quoting *Woods*, 60 F.3d at 1166), *cert. denied*, 522 U.S. 995, 118 S. Ct. 559 (1997).  Conclusory allegations of retaliation are insufficient to withstand summary judgment.  *Woods*, 60 F.3d at 1166.  "The relevant showing in such cases must be more than the prisoner's personal belief that he is the victim of retaliation."  *Johnson v. Rodriguez*, 110 F.3d at 310 (internal quotation marks omitted).  "The inmate must produce direct evidence of motivation, or the more probable scenario, allege a chronology of events from which retaliation may be plausibly inferred."  *Woods v. Smith*, 60 F.3d at 1166 (internal quotation marks omitted).

Mathis asserts that the defendants retaliated against him by denying him medical care and refusing him kosher meals.  (Docket Entry No. 10, Plaintiff's More Definite Statement, p. 3). Mathis bases his claim of retaliation on a series of unrelated incidents.  He asked for kosher meals on his arrival at the BCSO.  The defendants were providing pork-free meals.  In August 2008, the defendants began providing Mathis with kosher meals from an outside vendor.  Mathis then filed a grievance complaining of the denial of kosher meals based on the fact that the meals were not prepared apart from all other food.  Langley responded on September 3, 2008.  Mathis argues that Anguiano then stopped providing kosher meals as an act of retaliation.  But the summary judgment evidence shows that Anguiano stopped providing kosher meals in September 2008 because she realized that no court order mandating kosher meals applied to the BCSO. (Docket Entry No. 41, Defendants' Motion for Summary Judgment, Ex. B, p. 2).  Mathis has not alleged more than a subjective belief that he is the victim of retaliation. Mathis has not identified or submitted evidence of a chronology of events from which retaliation could be plausibly inferred. Mathis's conclusory allegations are insufficient to raise a fact issue as to whether the defendants retaliated against him for filing a grievance.  The defendants are entitled to judgment as a matter of law on this claim.

G.     **The Claim Based on an Inadequate Grievance Procedure**

Mathis alleges that Langley violated his civil rights by failing to respond positively to Mathis's grievances.  Mathis has not alleged or identified facts that show a due process violation. "A prisoner has a liberty interest only in freedoms from restraint imposing atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) (internal citation and quotation omitted).  An

inmate does not have a constitutionally protected liberty interest in having grievances resolved to his satisfaction.  There is no due process violation when prison officials fail to do so.  *Geiger v. Jowers,* 404 F.3d 371, 373-74 (5th Cir. 2005); *see also Edmond v. Martin, et al.,* slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue); *Thomas v. Lensing, et al.,* slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished) (same).  Nor has Mathis shown how the denial of his grievances was objectively unreasonable.  The summary judgment evidence shows that Langley investigated Mathis's grievances and provided timely responses that, for the reasons set out above, were objectively reasonable under the circumstances.  Langley is entitled to summary judgment based on qualified immunity.

### H.    The Due Process Claim About the Inmate-Account Funds

Mathis alleges that Alexander confiscated funds from his inmate account.  Mathis's claims are barred by the *Parratt–Hudson* doctrine.  *Hudson v. Palmer,* 468 U.S. 517 (1984); *Parratt v. Taylor,* 451 U.S. 527 (1981), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327 (1986).  Under this doctrine, alleged deprivations of property caused by the random and unauthorized misconduct of state actors do not infringe constitutional due process, provided that adequate state postdeprivation remedies exist.  *Alexander v. Ieyoub,* 62 F.3d 709, 712 (5th Cir. 1995).  When an inmate's property is taken without compensation, he has no federal court claim under 42 U.S.C. § 1983 for that loss unless there is no postdeprivation remedy or the remedy is inadequate.  *Marshall v. Norwood*, 741 F.2d 761, 764 (5th Cir. 1984).  Mathis has made neither of the required showings.

Additionally, the summary judgment evidence shows that the funds at issue were withdrawn under a court order.  Margie Alexander testified that:

> 1.  "My name is Margie Alexander.  I am of sound mind, over the age of 18, and capable of making this affidavit.  I have personal knowledge of the facts stated in this affidavit, and they are true and correct.
>
> 2.  I am an employee of the Brazoria County Sheriff's Office.  I served as the Inmate Trust Fund Bookkeeper until September 28, 2009.  I served in this position when Anthony Mathis was confined at the Brazoria County Jail.
>
> 3.  On August 5, 2008, the Brazoria County Sheriff's Office received an order from the United States District Court for the Southern District of Illinois to pay the Clerk of that Court money from Anthony Mathis's Inmate Trust Account.  The order instructed the Brazoria County Sheriff's Office to pay half of Mathis's inmate account unless the account had a balance less than $20.00.
>
> 4.  On September 23, 2008, Mathis's Inmate Account had a balance of $29.93.  On that date, the Brazoria County Jail issued a check to the Clerk of the United States District Court for $9.93."

(Docket Entry No. 41, Defendants' Motion for Summary Judgment, Ex. A, p. 1).

The summary judgment evidence shows that the funds were withdrawn from Mathis's inmate account to satisfy criminal monetary penalties of $850.00 imposed by the United States District Court for the Southern District of Illinois.   (Docket Entry No. 41, the Straughter Defendants' Motion for Summary Judgment, Ex. C-2 p. 7).   The defendants are entitled to judgment as a matter of law on this claim.

## I.     The Supervisory Liability Claim Against Sheriff Wagner

Under § 1983, a supervisory officer may only be held liable in his individual capacity if either of the following exists: (1) he is personally involved in the constitutional deprivation, or (2)

there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations.  *Kohler v. Englade*, 470 F.3d 1104, 1114-5 (5th Cir. 2006).  Mathis does not allege that Sheriff Wagner was personally involved in the alleged constitutional violation. Liberally construed, Mathis alleges that Sheriff Wagner failed properly to train or supervise the officers working under him who were directly involved in the decisions about Mathis's diet. (Docket Entry No. 2, p. 2; Docket Entry No. 10, Plaintiff's More Definite Statement, p. 1).

Section 1983 does not create liability for a supervisor based on the acts of subordinate employees.  *Oliver v. Scott*, 276 F.3d 736, 742 & n.6 (5th Cir. 2003).  *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999) ("Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983.").  Instead, an individual official may be liable only for participating in implementing a policy that is "itself . . . a repudiation of constitutional rights" and "the moving force of the constitutional violation." *Oliver*, 276 F.3d at 742.

Mathis asserts that through his staff, Sheriff Wagner implemented and enforced a policy that caused the violation of Mathis's right to practice his Jewish faith in the BCSO.  As discussed above, the summary judgment evidence shows that Mathis did have a constitutionally adequate opportunity to practice his faith in the BCSO.  This court previously determined that the failure to provide kosher meals was reasonably related to BCSO's legitimate penological interest in maintaining order and controlling costs.  Sheriff Wagner is entitled to summary judgment based on qualified immunity.

**V.      The Claims Against the Defendants in Their Official Capacities**

"Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y. City Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  A suit against a government official in his official capacity is the same as a suit against the entity the official represents.  *Graham*, 105 S. Ct. at 3105.  The official capacity claim that Mathis has asserted against Wagner is a claim against Brazoria County.  *See Bennett v. Pippin*, 74 F.3d 578, 584 (5th Cir.), *cert. denied*, 117 S. Ct. 68 (1996) ("A suit against the Sheriff in his official capacity is a suit against the County.").  A municipality such as Brazoria County "can be held liable for its policies and customs that engender constitutional deprivation, but it cannot be held liable for the actions of its non-policymaking employees under a theory of respondeat superior." *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003).

"Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694); *see Cox v. City of Dallas, Tex.*, 450 F.3d 734, 748 (5th Cir. 2005).  There must be both municipal culpability and causation.  *See Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998).  "Culpability includes both the involvement of a municipal policymaker and affirmative municipal action." *Piotrowski*, 237 F.3d at 578 n.17.  "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

Mathis has not shown a basis to hold Sheriff Wagner liable in his official capacity because he has not shown a basis to hold Brazoria County liable under § 1983.  First, Mathis has not raised a fact issue as to whether Brazoria County prevented him from exercising his religion.  Nor has Mathis presented or identified evidence that he was denied adequate medical care or denied due process.  Second, Mathis has not shown any basis to impose municipal liability.  Mathis has not alleged or identified facts that show an official policy or widespread pattern or practice that caused a violation of the First Amendment right to exercise his religion, the denial of medical care, or the denial of due process.  The motion for summary judgment dismissing Mathis's § 1983 claim against Sheriff Wagner in his official capacity and Brazoria County is granted.

## VI.    The State-Law Claims

If federal claims are dismissed before trial, generally the state claims should be dismissed or remanded as well.  *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").  A district court may decline to exercise supplemental jurisdiction over state-law claims where it has dismissed the federal claims.  *St. Germain v. Howard*, 556 F.3d 261, 363-64 (5th Cir. 2009) (citing 28 U.S.C. § 1367(c)).  Because Mathis's § 1983 claims have been dismissed, the court declines to exercise supplemental jurisdiction over the claims he asserts based on Texas state law. Mathis's state-law claims are dismissed without prejudice.

**VII.    Conclusion**

The motions for summary judgment filed by BCSO, Sheriff Wagner, and the Straughter

Defendants, (Docket Entry Nos. 37, 39, & 41), are granted.  The motions to dismiss filed by these

defendants, (Docket Entry Nos. 33, 34, & 35), are denied as moot.  Any remaining pending

motions are denied as moot.  Mathis's federal claims based on a violation of the First

Amendment, RLUIPA, denial of medical care, denial of equal protection, retaliation, denial of an

adequate grievance procedure, and denial of due process are dismissed with prejudice.  Mathis's

state law claims are dismissed without prejudice.

SIGNED on August 17, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge